May it please the Court, I'm Attorney Robert Barnes. I represent Mr. Nader and Mr. Dayen in this proceeding. This case involves an attorney fee petition filed after a successful Ninth Circuit appeal of the District Court's decision. The District Court made three errors of law in the decision that he issued. He ultimately reduced the fees by a little more than half compared to the fees requested. The District Court first denied all fees for work requested on a preliminary injunctive relief claim. The two causes of action that gave rise to the claim were the same causes of action that were ultimately successful in the litigation and fully successful. Much as the Supreme Court identified in Hensley, this was a case where the plaintiff sought multiple forms of remedy and relief. Partial remedy and relief was afforded, but the claims were fully vindicated. As the Court in Hensley noted, if a plaintiff sought monetary damages and injunctive relief and only got one or the other, that the District Court should not deny fees in toto for the failed remedy that was requested. So the District Court committed error in the whole-scale denial of those fees. In addition, this Court has ruled in Suzuki and, again, recently in Naderaja. In Suzuki, the plaintiff sought, thought about filing a motion to dismiss. Ultimately, he decided not to. Then he sought fees after the successful civil rights representation for the contemplated but unfiled motion to dismiss. This Court noted that because such research is necessary for a reasonable client, an ordinarily prudent attorney, then that was compensable, even though it was not ultimately sought, nor would it have been ultimately successful. It was simply a tactical decision that had to be researched and reviewed and pursued, and the fact that it was not successful did not mitigate the ultimate success of the litigation. And fees for that were compensable. That was Suzuki v. Yen, which is 678 F. 2nd, 761. This Court, again, in Naderaja v. Holder, recently issued in 2009, 569 F. 3rd, 906, noted that when a Petitioner had filed a writ of mandamus to try to expedite the litigation in that case, even though the writ of mandamus was itself not successful, the fees sought for it were compensable because it was part of an ultimately successful litigation. So consistently with Hensley, which has been a Supreme Court case law for 25 years and this Circuit's precedence governing over more than 25 years, the fees sought for the work done on the preliminary injunctive relief were compensable. I would only additionally add as to that aspect, much of the work that went into it, the district court confused why he denied the relief with the work that went into the relief. The work that went into the relief covered multiple issues. The defendant had filed every form of affirmative defense that existed, standing, mootness, estoppel, latches. I think there was a dozen different defenses raised. He even filed Rule 11 sanctions. You name it. The district court ultimately ruled in the plaintiff's favor on almost all of those issues, and it was only on one issue relating to the injunctive relief, the timing of the suit. Much of that work ultimately reduced the amount of work that ultimately had to be done. Much of the work was on the substantive merits about the probability of succeeding on the merits. That ultimately reduced the amount of time the counsel had to spend in the later parts of the proceedings, both at the summary judgment stage, which in turn reduced the amount of time spent on the appellate stage, all of which reduced the fee request in those matters. Not providing any compensation for any of the work done in the preliminary injunctive relief stage ultimately reduced the fees compensated for work that would have had to be performed anyway. The second legal error the district court made was ignoring the Kerr factors in determining what the reasonable hourly rate was, as well as ignoring the factors that the Supreme Court identified. Yes, ma'am. I've been through the papers that you filed in the district court, and I don't see any reference to the Kerr factors. It seemed to me that the district court considered the materials that you asked him to consider, which included the statistics and the other materials. So why should we now say, oh, you have to consider the Kerr factors, when he considered what you asked him to? Yes, Your Honor. There was two different things. He didn't refer to Kerr. He did, yes. You're correct, Your Honor. The main issue is that he didn't go into any we gave him a bunch of evidence as to what we believe the reasonable rate was. We talked about what our current billing rate was, what our prior billing rate was, what our understanding of civil rights fees, First Amendment lawyers in Arizona billing rate was. What we considered the most analogous comparable area of law, which was appellate advocacy in the state of Arizona, what those fee rates were, given an adjusted rate. We provided what other district courts had done in Arizona, other district courts across the country, other circuit courts, and First Amendment and civil rights law had done, including what this judge himself had done in three prior cases, where he had made findings as to what the median and the typical going market rate was for civil rights attorneys. All of those supported a fee somewhere between $300 and $450 an hour. We requested $350 an hour for lead counsel in the case, which consumed most of the time, and $125 an hour for the paralegal clerk, who did the second most amount of time. The district court ultimately didn't discuss any of those pieces of evidence. He isolated only one piece of evidence, which was what all practicing attorneys in Arizona was, not looking at their particular category, and then only looking at age as the guiding determining factor. And then he picked only the median rate, and then he picked the median rate that was 3 years old. So we ended up with one of the lowest rates for First Amendment lawyers ever awarded in a First Amendment case in the last 8 years. In fact, it's less than this circuit approved 10 years ago. It's the same rate that was approved 10 years ago for our firm. And when we were just out of law school, it's a rate that was about the same rate that was approved about 15 years ago in the Arizona appellate courts. So it's an extraordinarily low rate. And I think what the Supreme Court identified in Perdue was, in order to avoid the natural tendency of any court to infuse its own perception of the parties or a perception of the litigation with the fee determination, is to not rely on one exclusive factor. And in particular, the Supreme Court in Perdue, which did, to the detriment of the district court, come after the district court issued its decision, was that a district court should not rely on one exclusive factor. And it particularly identified age of admission since years for the bar, because often that will not capture the – what went into the litigation. And here, our concern was not so much that he didn't know Kerr. It was the manner in which he applied Kerr. In the manner in which he applied Kerr, he didn't look at, okay, what kind of skill set was necessary to do this kind of litigation? How is it analogous to the real marketplace, both for these attorneys, for Arizona attorneys, for former civil rights attorneys, for First Amendment lawyers in other cases? And that the district court did not do in ultimately giving the lowest possible fee. The third component is the – which is relatively modest – travel cost. This Court identified in Davis that travel costs are compensable and that time spent for travel is compensable. It is what is reasonably and typically billed. Ultimately, this case goes beyond my firm or these litigants. It goes to the ability of individuals like Mr. Dater to secure highly competent and high caliber attorneys to do very important representation in an area of law that matters to people all across the country. I reserve the remainder of my time. May it please the Court. My name is Jim Barton. I'm here on behalf of Arizona Secretary of State Ken Bennett. I'd like to first talk about what the Court considered in determining what was the prevailing market rate in the relevant community.  I'm not a lawyer. First, the Court considered the rate survey that the fee applicants provided the Court. The Court also said in page 2 of the supplemental order, it explained that it did consider the experience, skill, and reputation of these attorneys. And also in the initial order on page 4 to 5, the Court explained that it looked at all this information that supported a rate of $200 to $250 an hour. And it found no evidence that that would establish that these attorneys should be paid in the 95th percentile. So the Court did look at the other evidence that was provided by the fee applicants here, and within its discretion, determined that they did not deserve an upgrade to the very top among the attorneys practicing in Arizona. That evidence that was supplied, like I said, for the most part supported, frankly, the $200 to $250 range that the State supported with the declaration from Tim Casey. The reason why I think the declaration from Tim Casey is important is because Tim Casey has practiced political law in Arizona for 18 years, and he so established that he had a foundation to comment on the rates that were typical in Arizona. The only evidence that the plaintiffs provided that was opposed to that was their own declarations. And, in fact, in Mr. Barnes' declaration, he did say that he understood that there were higher rates, but he didn't provide any foundation for why he would know what the prevailing market rate was in Phoenix, Arizona. He also said that he had a client who told him that it had been as high as $850 an hour. But that sort of evidence doesn't go to go very much against a survey done by the State Bar that was scientific and sort of surveyed lots of information, and it doesn't go against a declaration from an attorney who had been practicing for 18 years in the jurisdiction. Also, the other evidence that was submitted to support was fairly informal news stories about this firm, and some of it dealt with civil rights litigation and some of it didn't deal with civil rights litigation. So I believe that the evidence that was supported all sort of circled around about $200 to $250 an hour, and the Court was within its discretion to assign the value of $200 an hour. Turning to the question about the time spent on the case, first off, the Court allowed 360 hours for this case that was basically a motion for summary judgment. It disallowed the time spent on the preliminary injunction, and it discounted the time spent on the appeal. Well, the argument with respect to the preliminary injunction is that they researched all the issues and had to present the issues on the preliminary injunction, and that, therefore, that work should contribute toward the ultimate victory. Why isn't that a good argument? Well, Your Honor, the district court had this case in front of it, and it saw both the preliminary injunction phase and it also saw the trial, the motion for summary judgment phase, and it determined that that work done on the preliminary injunction phase did not contribute to the success. What it says at the top of page 4 is that the time spent on the unsuccessful preliminary injunction, and this is the original order, did not contribute to the ultimate victory in the lawsuit. So in other words, the Court, having seen the practice before him, determined that this preliminary injunction, which was unwisely brought, which involved having to defend a 6-week order. But the argument is that the time they spent researching that would have been, would have contributed to the ultimate victory.  to the ultimate victory. The Court found, with respect to the merits, it didn't matter whether they lost or not. Well, Your Honor, the district court concluded that it was not, it did not contribute to the ultimate victory. So in other words, although perhaps some of the time was spent on the merits, the fee applicants have suggested that some of the time that they spent on the preliminary injunction did ultimately contribute to the, did contribute to the ultimate victory. The Court found, the district court found, that it didn't. It found that. Well, it seems, the district court seemed to, maybe this is a, maybe I'm misreading what the district court did, but basically it seemed, it appeared to me that the district court said, look, you didn't win the preliminary injunction. I denied it because it was filed, it wasn't timely filed. I don't see how the two relate. And that's a different finding than saying, look, the legal work done could be, could have saved time ultimately in the case in terms of the briefing time. I don't think that, it doesn't appear to me that the district court did the second kind of analysis. Do you agree with me or not? I don't agree, Your Honor. I think the district court said both things. The district court said that because you were unsuccessful in the preliminary injunction motion. And that was an action that was not related to the ultimate success on the motion for summary judgment. So in one sense it was an unsuccessful action. That time is not going to be compensated. But then I also think because the Court made its comment that the time spent on the unsuccessful preliminary injunction, again, the Court now is referring specifically to the time there. And this is at the top of page 4 on the initial order. Right. But that refers to, there's a whole page of the district court's analysis saying, look, that was a completely unsuccessful waste of time petition. And then it starts off on page 4. Under these circumstances, we cannot say that the time spent on the unsuccessful preliminary injunction motion contributed to the ultimate victory. Now, I understand, if I understand what the district court is saying, it said, look, that episode was a waste of time and didn't contribute. But I don't see any analysis in here, unless you can point it to me, that says, that addresses the argument that the plaintiffs are making here, which is, look, there's a core of research here that saved us time later, and we ought to be able to compensate for that. Well, Your Honor, the only analysis I can point to is that sentence that follows. I believe that you can't analyze this from both directions. In other words, as a separate action that was unsuccessful and then also as a waste of time. But as far as what the Court says, that's all that the Court says on this. I do think it's valuable to consider how not only was the action delayed, but also the action sought relief that was – that couldn't be granted. So by the time they filed the action six weeks later, they were asking the Court to just put Mr. Nader on the petition, or they were asking the Court to sort of hold up the election process to give him a chance to collect signatures. Neither of those solutions were viable solutions, and that, in fact, is why the Ninth Circuit did not overturn the decision to deny the preliminary injunction. So in other words, it's not just that it was delayed. It also was seeking relief that didn't make sense given the time that it was sought. And I think that to point you to a case where you see an analogy to this, in Carson v. Billings, P.D., the Court did not compensate the ultimately successful attorneys for some work that they did on an administrative hearing, an administrative work that was not related, that was basically the same kind of thing. It was wasted time. It was in the wrong venue. And I think in this case, particularly when you're looking at an election law case where – What case is that? I'm sorry. Carson v. Billings, P.D. That's 470F3-889. Carson v. Billings was a sex discrimination case in which there was several hours spent, I think it was 20 hours spent, towards an administrative appeal that was before another action had been taken by the State. In other words, it was wasted time sort of in the wrong venue. I think it's analogous to this case in the sense that in election law cases, the timing is very important. The time frames for printing ballots are very important. We see Latch's arguments come up a lot. And when it got to be August and the plaintiffs weren't able to go forward with their preliminary injunction motion, they had to know that it was a waste of time to file that motion. Let me put my question a different way. Let's assume that – was there about $40,000 at stake here? Yes. Depending on the hourly rate allowed. Right. So let's assume that half of that is directed to procedural matters and half of that is directed to a briefing whether or not they ought to prevail on the merits and that briefing can be imported into the final summary judgment product. Why couldn't – why shouldn't they be able to get an award for the amount that can be related to the final briefing product on summary judgment? Your Honor, I think that that would be possible. That would have been within the Court's discretion to view that work and to determine what part of it was helpful and what part of it wasn't. The Court did not give them credit for any of those hours. I will note that the Court gave them credit for 360 hours on a motion for summary judgment. So, you know, the record doesn't really support that there was a lot of discounted time given that we had 360 hours for a motion for summary judgment. So I think – I think it's – it would have been within the Court's discretion to do that, to sort of find some ratio of the time. But I also think it was within the Court's discretion to decide not to do that and to just – to eliminate the time spent on that wasteful preliminary injunction motion and on the subsequent unsuccessful appeal. I would like to talk, too, about the similar thing which happened when, at the end of the case, when they appealed and they were successful in the appeal, but they asked for – I'm using rough numbers – approximately $250 – 50 hours on the appeal. The trial court was in a good position to see what kind of work had been done in the motion for summary judgment and then to look and see what kind of judgment had been done on the appeal and made a reasonable determination that 80 of those 250 hours were excessive and so discounted some of the appeal work down to 170 hours. So in both cases, at both extremes, I think the judge was within his discretion in reducing their hours. Okay. So I think taken together, we saw a large deduction in the attorneys' fees. I agree. But that deduction is largely justified by first taking off these time chunks, which the Court fairly well explained. I mean, the Court explained why the preliminary injunction was so bad and why it was such a waste of time. The Court explained that on the back end, on the court of appeals, it was fairly duplicative, although you don't need much more explanation to understand what it means to say the work was duplicated. And then we have this basically taking fees that are much above the prevailing market rate in Phoenix and then reducing them down to the prevailing market rate in Phoenix. And so I think that those factors are what causes the large deduction. It wasn't that this was some sort of an across-the-board reduce the fees by 50 percent. Rather, I think the judge did a good job of explaining why he was doing what he was doing. The district court didn't articulate with specific reference to the Kerr factors. What significance is that? I don't think it has any significance, Your Honor. In fact, in Perdue v. Kenney, you see the – in Justice Alito's opinion, he sets out the Kerr factors as a separate way to determine attorneys' fees. In fact, he sort of comments that the Kerr factors are not very helpful because they – there are so many of them they give too much discretion to the district court. That's at – that's at 1672, 130 Supreme Court, 1672, where basically the Supreme Court has said that the Kerr factors are really not helpful and has said that the Lodestar method is better. If you need to have an enhancement, perhaps some of the Kerr factors will work. But again, the Court, as it has frequently found, found that there's no reason to enhance beyond the Lodestar rate. That's a very high burden, and the plaintiffs just didn't meet that here. If there are no questions. Thank you. Briefly in reply. First, as to the evidence submitted in support of the reasonableness of the rates, this Court in Sorenson v. Mink, 239, F2nd – I'm sorry, F3rd, 1140, noted that the proposed rate should be presumed reasonable unless the defendant provides counter evidences to their unreasonableness. That was not done here. Secondly, this Court ruled in Bowman v. Black, 940, F2nd, 1121, that declarations are sufficient evidence of what the reasonable rate is. Let's look at the practical effect of what affirming the district court here would do to civil rights lawyers. It would multiply the litigation done at the rate level. So what happened in attorneys' fees petitions, attorneys in my position would go out and get 20 declarations, 30 declarations, 40 declarations, put in massive amounts of evidence to show precisely how and why a rate that had been approved by this district court as the going market rate for civil rights attorneys, not the market rate for all attorneys in the State, which is the only standard the defendant is talking about. They're talking about the 95th percentile three years prior for all attorneys solely based on age. Basically, it was like an Excel spreadsheet. You could plug in different numbers, and the judge plugged in the one number that would give us the lowest conceivable rate. And he isolated that factor as the only dispositive or determinative factor. That's what the Court in Purdue said was not the proper methodology. And secondly, as to, in fact, the rates were our current billing rates paid by actual clients during the period of time of litigation, the same rate approved by district and the rates approved by this court, by that particular district court as the going market rate in Arizona for civil rights attorneys. That is sufficient evidence to warrant the fee, and the Court's ignoring those factors was legal error. Finally, on the preliminary injunctive aspect, the actual underlying briefs would show that 75 to 80 percent of what was being argued was all about the substantive merits. Ultimately, the State walked away from several of the defenses they raised because of success at the preliminary injunctive relief that the district court implied for the plaintiffs on certain host and range of substantive defenses independent of the one the district court ruled on. The district court confused the reason why he did something with the work that went into the preliminary injunctive stage, and that was legal error. Thank you. Thank you. The matter just argued is submitted for decision. We'll hear the last case for argument, which is Apple v. Pystar. Oh, yes. Would you like to take it? Yes. Absolutely.  I marched right through. The Court will stand in recess for 10 minutes before hearing the last case. All right.
judges: Schroeder, Thomas, Gould